IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SAM GONZALES, MARIA CROSBY )
and MARIANA CORREA, )
 )
          Plaintiffs, ) No. 02 C 8346
 )
    v. ) Judge Ronald A. Guzmán
 )
CITY OF AURORA and the AURORA )
CITY COUNCIL, )
 )
          Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs have sued defendants for their alleged violations of the Fourteenth Amendment and Section 2 of the Voting Rights Act, 42 U.S.C. § 1973(a). The case is before the Court on defendants' Federal Rule of Civil Procedure ("Rule") 56 motion for summary judgment. For the reasons set forth below, the motion is granted.

### Facts[1]

Plaintiff Sam Gonzales is a Latino resident of the City of Aurora ("the City"). (Defs.' LR 56.1(a) Stmt. ¶ 2.) Gonzales lives in the City's second aldermanic ward. (*Id.*) Plaintiff Maria Crosby is a Latina resident of the City. (*Id.* ¶ 3.) Crosby lives in the City's fourth aldermanic ward. (*Id.*) Plaintiff Mariana Correa is a Latina resident of the City. (*Id.* ¶ 4.) Correa lives in the City's seventh aldermanic ward. (*Id.*)

---

[1]Unless noted otherwise, the following facts are undisputed.

In March 2001, the U.S. Census Bureau released the 2000 census data. (*Id.* ¶ 10.) That data showed that the City's total population was 142,990, 32.6 percent of whom identified themselves as Latino. (*Id.* ¶¶ 11-12.)

When the census data was released, the City Council had a total of ten members: eight alderman elected from each of the eight single-member wards and two aldermen-at-large elected city-wide. (*Id.* ¶ 24.) After the data was released, the Council formed a ward-redistricting committee to determine whether the districts should be redrawn in light of the census figures. (*Id.* ¶ 25.) The committee had five members: Alderman-at-large Robert O'Conner, who was the chairman, Second Ward Alderman David Marquez, Seventh Ward Alderwoman Scheketa Hart-Burns, Eighth Ward Alderman Chris Beykirch and Sixth Ward Alderman Michael Saville. (*Id.* ¶¶ 26-27.) The City assigned employees William Wiet, the Director of Community Development, William Spaeth, the Deputy Director of Community Development and *de facto* head of planning, and Mathews Prakadan, an employee of the City's Geography Information Systems Department, to assist the committee. (*Id.* ¶¶ 29-33.)

The record does not describe the committee's activities between March 2001 and March 2002. In March 2002, however, a referendum was placed on the ballot during the primary election asking City voters whether the Council should be expanded to twelve members: ten elected from each of ten single-member wards and two aldermen-at-large. (*Id.*, Ex. L, Defs.' Answer Interrog. No. 18.) The referendum passed. (*Id.*)

After multiple revisions, consultation with legal counsel and a public hearing, Proposed Ward Map Final Draft 3 was prepared. (*Id.* ¶¶ 44, 49, 60-63, 65-72.) On that map, more than half of the residents of the second, third and seventh wards were Latino. (*Id.* ¶ 73.) On August 13, 2002, the Council adopted Proposed Ward Map Final Draft 3 as the City's ward map. (*Id.* ¶ 75.)

In the fall of 2002, in response to complaints from the Latino community, the City Council voted to repeal the ward map it had adopted in August. (*Id.* ¶¶ 76-78.) Ultimately, it was replaced with the map at issue in this suit ("the Ward Map"). (*Id.* ¶¶ 79-80.)

The Ward Map provides for ten wards of substantially equal population. (*Id.* ¶ 81.) Under the Ward Map, 74.54 percent of the population of the second ward, 66.27 percent of the population of the seventh ward and 52.61 percent of the population of the third ward is Latino. (*Id.* ¶¶ 15, 18, 21.) The Latino population of the first and fourth wards, however, is only 38.63 percent and 27.56 percent, respectively. (Second Am. Compl. ¶ 25.)

Plaintiffs contend that the Ward Map impermissibly dilutes the votes of the Latino electorate by fracturing and packing the Latino population into the first, second, third, fourth, sixth and seventh wards. (*Id.* ¶ 26.)

## Discussion

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

As an initial matter, defendants argue that plaintiffs lack standing to pursue their claims. It is undisputed that plaintiff Gonzales lives in the City's second ward, plaintiff Crosby lives in the

3

City's fourth ward and plaintiff Correa lives in the City's seventh ward. (Defs.' LR 56.1(a) Stmt. ¶¶ 2-4; Pls.' LR 56.1(b)(3)(A) Stmt. ¶¶ 2-4.) Defendants say that there is no evidence that the votes in those wards were diluted. Thus, they argue that plaintiffs have no standing to sue under either the Voting Rights Act or the Fourteenth Amendment.

The Court disagrees. The gravamen of plaintiffs' claims is that the Ward Map diminishes their voting power, and that of other Latinos, by packing the Latino population into wards two and seven and fracturing it among wards one, three and four. Plaintiffs contend that the effect of the disproportionate assignment of Latinos among those wards is to dilute the votes of each Latino in those wards. Because each plaintiff resides in one of the allegedly gerrymandered wards, they have standing to pursue their claims. *See Shaw v. Hunt*, 517 U.S. 899, 904 (1996) (stating that "a plaintiff who resides in a district which is the subject of a racial-gerrymander claim has standing to challenge [under the Fourteenth Amendment] the legislation which created that district").[2]

In Count I of the second amended complaint, plaintiffs allege that the Ward Map violates Section 2 of the Voting Rights Act. That section prohibits the City from adopting any practice or procedure that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). Section 2 is violated "if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election . . . [give] members [of the protected class] less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).

---

[2]The *Shaw* Court did not address standing under the Voting Rights Act. But, because the parties assume that the test for standing under that statute is the same as that set forth in *Shaw*, so do we.

4

There are three threshold showings that a minority group must make to pursue a Section 2 claim: (1) "it is sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) "it is politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 49-51 (1986). If plaintiffs make those threshold showings, they must then demonstrate, under the totality of the circumstances, that the challenged Ward Map gives Latinos less opportunity than other voters to elect representatives of their choice. *See id.* at 78; *see also Harper v. City of Chi. Heights*, 223 F.3d 593, 596 (7th Cir. 2000) (noting that the *Gingles* factors are "threshold requirements to a Section 2 vote dilution claim.")

In the context of a claim like this one, "the first *Gingles* condition requires the possibility of creating more than the existing number of [effective minority] districts." *Johnson v. DeGrandy*, 512 U.S. 997, 1008 (1994). The precise number of minorities required to create an effective minority district, *i.e.*, a district in which the minority population has a fair chance of electing the candidate of its choice (Defs.' LR 56.1(a) Stmt. ¶ 88; Pls.' LR 56.1(b)(3)(A) Stmt. ¶ 88), depends on a variety of factors, including: the residents' political attitudes and behaviors, the characteristics of the candidates and the details of the campaigns. (Defs.' LR 56.1(a) Stmt. ¶ 90; Pls.' LR 56.1(b)(3)(A) Stmt. ¶ 90.) Plaintiffs' expert, Dr. Jorge Chapa, did not analyze those factors in this case. (Defs.' LR 56.1(a) Stmt. ¶ 91; Pls.' LR 56.1(b)(3)(A) Stmt. ¶ 91.) Rather, he relied on a redistricting "rule of thumb" that the population of a district must be at least 65 percent Latino for it to be an effective Latino district. (Defs.' LR 56.1(a) Stmt., Ex. P, Chapa Dep. at 90.) In defendants' view, Chapa's use of the rule of thumb, instead of particularized data for each district, renders his opinion invalid.

The Court disagrees. The Seventh Circuit has explicitly approved use of the rule of thumb in Section 2 cases. *See Ketchum v. Byrne*, 740 F.2d 1398, 1415 (7th Cir. 1984) (noting that "a

guideline of 65% of total population (or its equivalent) has achieved general acceptance in redistricting jurisprudence," "has been adopted and maintained for years by the Department of Justice and by reapportionment experts and has been specifically approved by the Supreme Court . . . as representing the proportion of minority population reasonably required to ensure minorities a fair opportunity to elect a candidate of their choice"); *see also Barnett v. City of Chi.*, 141 F.3d 699, 703 (7th Cir. 1998) (stating that the use of the rule of thumb "is well entrenched in the [Section 2] cases"). Though *Ketchum* authorizes district courts to use particularized data, "if such data can yield a meaningful and persuasive result," 740 F.2d at 1415, it does not require them to do so. *Id.* Given our court of appeals' acceptance of the rule of thumb, we have no reason to reject it.

Dr. Chapa's use of the rule of thumb is not, however, the only flaw defendants perceive in his analysis. They also contend that he relied on the wrong population. In defendants' view, the Seventh Circuit's opinion in *Barnett* makes the relevant population for the first *Gingles* factor Latinos who are citizens and are of voting age ("LCVAP"). Because Dr. Chapa used the total number of Latinos in each district rather than the LCVAP in his analysis, defendants say it must be rejected.

Once again, the Court disagrees. The *Barnett* court said that the citizen voting age population ("CVAP") is "the proper benchmark for measuring *proportionality*." 141 F.3d at 705 (emphasis added). Whether minority voting power is proportional to majority voting power is not, however, one of the *Gingles* threshold determinations. Rather, as the *Barnett* opinion illustrates, proportionality is relevant to the second step of the analysis, ascertaining whether Latinos have less opportunity to elect representatives of their choice. When the *Barnett* court considered whether additional effective minority districts could be created, it used the 65 percent rule of thumb. *See id.* at 703 ("A black-majority ward . . . is one that is at least 65 percent black on a total-population basis,

6

and a Latino-majority ward is one that is at least 65-70 percent Latino on the same basis.") It was not until it reached the second part of the Section 2 analysis that the court relied on CVAP. *See id.* at 705 ("[T]he proper benchmark for measuring proportionality is citizen voting-age population" because "[a] group that has . . . [the] power to elect the representatives of its choice . . . equal to its fraction of the electorate will be hard-pressed to demonstrate . . . that its members nevertheless 'have less opportunity than other members of the electorate . . . to elect representatives of their choice.'") (quoting 42 U.S.C. § 1973(b)). Thus, Dr. Chapa's use of total population figures for the first *Gingles* factor does not invalidate his analysis.

The next question is whether Dr. Chapa's analysis suggests that at least one additional ward with a total Latino population of at least 65 percent can be created in Aurora. The answer is yes. It is undisputed that wards two, three and seven of the contested Ward Map have Latino populations of 74.54 percent, 52.61 percent and 66.27 percent, respectively. (Defs.' LR 56.1(a) Stmt. ¶¶ 15, 18, 21.) Dr. Chapa opined that ward three could be transformed into an effective Latino ward, defined by the rule of thumb, by exchanging some of its low-density blocks with a few of the high-density blocks of wards two and seven. (*See* Pls.' Opp'n Defs.' Mot. Summ. J., Ex. 1, 9/21/04 Chapa Report at 6.) Moreover, Dr. Chapa says those changes could be made without substantially altering the boundaries of the other wards on the contested Ward Map. (*Id.*) Though defendants disagree with Dr. Chapa, his assertions are sufficient to defeat summary judgment on this issue.

Defendants also argue that plaintiffs have no evidence of the third *Gingles* factor, that the white majority votes as a bloc which normally results in the defeat of the Latino candidate of choice. On this point, plaintiffs offer the testimony of Dr. Anirudh Ruhil, who analyzed various City elections from 1991 through 2003, but only those that involved a Latino candidate. (*See* Pls.' Opp'n

Defs.' Mot. Summ. J., Ex. 3, Ruhil Report at 1-2.) Defendants say that limitation invalidates his analysis.

Defendants' argument is based on the Eighth Circuit's decision in *Clay v. Board of Education of City of St. Louis*, 90 F.3d 1357 (8th Cir. 1996). In that case, African-American residents of the City of St. Louis claimed that the at-large voting system used to elect members of the City's Board of Education violated Section 2 of the Voting Rights Act. *Id.* at 1358. The district court rejected plaintiffs' bloc voting evidence because their expert assumed that African-American voters prefer African-American candidates, rather than analyzing whether that was true in any given race. *Id.* at 1360. Because plaintiffs had no bloc voting evidence, the court dismissed their claim, and plaintiffs appealed. *Id.*

The Eighth Circuit agreed with the district court. Plaintiffs' assumption that African-American voters always prefer the African-American candidate, the court said, "is untenable" " as a matter of law." *Id.* at 1361. Instead of making such an assumption, "[p]laintiffs must prove, on an election-by-election basis, which candidates are minority-preferred." *Id.* By limiting his analysis to races involving Latino candidates, defendants say that Dr. Ruhil made the assumption condemned in *Clay*.

Defendants interpret *Clay* too broadly. The *Clay* court did not say that only elections involving two white candidates are probative of the issue of racially polarized voting. Rather, it said that the preference of minority voters must be established through analysis, regardless of the race of the candidates in any contest. *Id.* Dr. Ruhil's report comports with *Clay*. Though he limited his analysis to races involving a Latino candidate, Dr. Ruhil did not simply assume that Latino voters preferred Latino candidates. Instead, he performed a regression analysis to determine that Latino voters preferred Latino candidates and non-Latino voters preferred non-Latino candidates in five of

8

the six elections he analyzed. (*See* Pls.' Opp'n Defs.' Mot. Summ. J., Ex. 3, Ruhil Report at 5-9.) In short, *Clay* provides no basis for rejecting Ruhil's conclusion that the non-Latino majority in Aurora normally votes as a bloc for candidates opposed by Latino voters.

Though plaintiffs have some proof of the three *Gingles* factors, that is not all they need to defeat defendants' motion. To proceed to trial, they must also produce evidence that suggests, under the totality of the circumstances, that the Ward Map gives Latinos less opportunity than other voters to elect representatives of their choice. *Gingles*, 478 U.S. at 78; *Harper*, 223 F.3d 593, 596. "An important consideration in deciding whether a districting plan discriminates is whether the plan creates majority districts for each group in proportion to each group's electoral potential." *Barnett*, 141 F.3d at 703. Defendants say that the Ward Map creates majority Latino wards in proportion to the City's LCVAP, and thus, no triable fact issue exists on plaintiffs' section 2 claim.

Defendants' expert, Dr. Kimball Brace, estimated the City's 2000 LCVAP as 16.26 percent, using sample data from the U.S. Census Bureau. (Defs.' LR 56.1(a) Stmt. ¶ 14; *id.*, Ex. F, Brace Report at 11-13.) And, though he acknowledged that the Latino population has increased in the years since the census, Dr. Brace did not provide a City-wide estimate of the current LCVAP. (*Id.*, Ex. F, Brace Report at 13.)

Plaintiffs' expert, Dr. Chapa, says that Dr. Brace's estimate of the 2000 LCVAP is unreliable because of the error inherent in using sample, rather than 100 percent, census data. (Pls.' Opp'n Defs.' Mot. Summ. J., Ex. 2, 12/31/05 Chapa Report at 1-2.) Moreover, he estimates the City's current LCVAP to be between 18.9 and 20 percent. (*Id.* at 3-6.)

If plaintiffs are correct, and for purposes of this motion we must assume that they are, then Latinos should be able to choose about 20 percent, or two, of the City's twelve alderman. The Ward Map, which the parties agree contains two effective Latino districts, achieves that goal. (Defs.' LR

9

56.1(a) Stmt. ¶¶ 15, 18; *id.*, Ex. P, Chapa Dep. at 90; Pls.' LR 56.1(b)(3)(A) Stmt. ¶¶ 15, 18.) Thus, even under plaintiffs' version of the facts, the Ward Map gives Latinos the opportunity to elect aldermen in proportion to their representation in the City's population.

Though "[a] group that has . . . power to elect representatives of its choice . . . equal to its fraction of the electorate will be hard-pressed to demonstrate [a violation of section 2]," *Barnett*, 141 F.3d at 705, proportionality is not the only factor to be considered in the totality of the circumstances analysis. *DeGrandy*, 512 U.S. at 1017-18 (refusing to make proportionality "a safe harbor for any redistricting scheme"). Rather, courts may also consider the so-called "Senate Report factors":

> [1] the history of voting-related discrimination in the State or political subdivision; [2] the extent to which voting in the elections of the State or political subdivision is racially polarized; [3] the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; [4] the exclusion of members of the minority group from candidate slating processes; [5] the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; [6] the use of overt or subtle racial appeals in political campaigns; and [7] the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Gingles*, 478 U.S. at 44-45 (citation omitted). If there is evidence to suggest that these or other factors prevent Latinos from electing representatives of their choice despite the electoral proportionality, defendants' motion must be denied.

The *Gingles* Court characterized the second and seventh Senate Report factors as "the most important." *Id.* at 51 n.15. Plaintiffs say the reports of their experts provide evidence on both.

The Court disagrees. Though Dr. Ruhil's report shows that "[r]acially polarized voting exists in Aurora," as plaintiffs contend (*see* Pls.' Supplemental Br. Opp'n Defs.' Mot. Summ. J. at 9), the

second Senate Report factor is not whether racially polarized voting exists, but the *extent* to which it exists:

> The Senate Report recognizes that racially polarized voting is a relative concept by instructing courts to assess not only the existence of racially polarized voting, but the *extent* of such voting. Indeed, the existence of racially polarized voting will frequently, if not always, be established by satisfying of [sic] the second and third *Gingles* factors. Under the totality of circumstances inquiry, the focus is on the degree of racially polarized voting. When the pattern of racially polarized voting is severe – that is, when minority and white voters rarely engage in cross-over voting – an at-large election scheme is more likely to dilute minority voting strength in violation of Section 2. Conversely, when the pattern of racially polarized voting is slight, and there is substantial cross-over voting between minority and white voters, an at-large election scheme is less likely to dilute minority voting strength in violation of Section 2.

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 748-49 (5th Cir. 1993) (citations omitted) (emphasis in original).

Dr. Ruhil's data show that the degree of polarization varies from election to election but averaged 54 percent over the period he studied. (*See* Pls.' Opp'n Defs.' Mot. Summ. J., Ex. 3, 9/04 Ruhil Report at 8 (showing polarization rates ranging from 22 percent to 73 percent in elections between 1991 and 2002).) In the 1991 and 1997 races for second ward alderman, for example, the Latino candidate garnered 79 percent and 74 percent, respectively, of the Latino vote, but only 6 percent and 7 percent, respectively, of the non-Latino vote. (*Id.*) In the same race in 2001, however, the Latino candidate received 67 percent of the Latino vote and 45 percent of the non-Latino vote. (*Id.*) Similarly, in the 1996, 2001 and 2003 elections for state and county offices, the Latino candidate received all or nearly all of the Latino vote and more than a third of the non-Latino vote. (*Id.*) In short, Dr. Ruhil's data show that Aurora elections can be severely polarized but generally are not because there is frequent cross-over voting, particularly by non-Latinos. *See League of United Latin Am. Citizens*, 986 F.2d at 749 (stating that polarization is "severe" when "minority and

white voters rarely engage in cross-over voting"); *see also United States v. Charleston County*, 365 F.3d 341, 350 (4th Cir. 2004) (stating that elections in Charleston County between 1984 and 2000, which had an overall polarization rate of between 75.8 percent and 94 percent, were "severely" polarized).

With respect to the seventh Senate Report factor, the minority group's electoral success, plaintiffs say that there has been "a near total failure of a Latino candidate to be elected to the Aurora City Council." (Pls.' Supplemental Br. Opp'n Defs.' Mot. Summ. J. at 10.) But Dr. Chapa's report belies that assertion. As noted above, Dr. Chapa estimates Aurora's current LCVAP to be between 18.9 percent and 20 percent. (Pls.' Opp'n Defs.' Mot. Summ. J., Ex. 2, 12/31/05 Chapa Rep. at 6.) Consequently, Latinos should be able to elect 20 percent, or two, of the City's twelve aldermen. Currently, the City has two Latino alderman, one elected and one appointed. (Pls.' Supplemental Br. Opp'n Defs.' Mot. Summ J. at 14; Defs.' Supplemental Br. Supp. Mot. Summ. J. at 12.) Moreover, a Latina was elected to represent the 83rd District in the Illinois General Assembly. (Defs.' Supplemental Br. Supp. Mot. Summ. J. at 12; Pls.' Opp'n Defs.' Mot. Summ. J., Ex. 3, 9/04 Ruhil Report at 8.) In short, the evidence shows that Latinos have not been elected to office in direct proportion to their LCVAP, but it does not show that they have been shut out of office, as plaintiffs contend.

Plaintiffs fare no better with the remaining Senate Report factors. Plaintiffs offer no evidence on factors one and four, which address the history of voting-related discrimination in the City and the extent to which Latinos are excluded from any candidate slating processes.

Factor three concerns the extent to which the City has used voting practices that have the potential to enhance discrimination. Plaintiffs says that the City's adoption of a map with ten wards

12

and two at-large alderman instead of one with twelve wards is such a voting practice. In other words, plaintiffs say the Ward Map is a discriminatory voting practice that tends to prove that the Ward Map is discriminatory.

Senate factor three, however, concerns voting practices *other* than the one challenged in the suit. *See Gingles*, 478 U.S. 39-40, 79 (affirming district court's holding that North Carolina's redistricting plan for state offices violated the Voting Rights Act and noting that the district court "considered *other* voting procedures that may operate to lessen the opportunity of black voters to elect candidates of their choice" including "[the] majority vote requirement for primary elections" and the state's lack of a subdistrict residency requirement for officials elected from multi-member districts) (emphasis added). Thus, plaintiffs' belief that the Ward Map – the voting practice they challenge – is discriminatory, does nothing to advance their case.

What would advance their case is evidence that the City has engaged in other discriminatory voting practices like stuffing ballot boxes for non-Latino candidates, committing or condoning violence against Latino voters, permitting only non-Latinos to vote, permitting only property holders to vote, levying a poll tax, prohibiting single-shot voting, impeaching Latino office-holders or annexing or severing territory to prevent Latinos from electing representatives of their choice. *DeGrandy*, 512 U.S. at 1018-19 (listing these and other examples of Senate Report factor three). The record contains no such evidence.

Nor is there any evidence that Latinos "bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process," Senate Report factor five. *Gingles*, 478 U.S. at 45. Dr. Chapa noted that the median income for Latino families in Aurora is much lower than that for non-Latino families, that Latinos

have lower levels of education than non-Latinos, that Latinos are more likely to rent their dwellings than are non-Latinos and that Latinos are less likely to be employed by a unit of government than are non-Latinos. (*See* Pls.' Mem. Opp'n Defs.' Mot. Summ. J., Ex. 1, 9/04 Chapa Rep. at 3-5.) But Dr. Chapa simply reported those statistics. He did not offer any opinion about what caused the differences between Latinos and non-Latinos, let alone opine that they were spawned by discrimination. Accordingly, plaintiffs have no evidence on Senate Report factor five.

The evidence plaintiffs have proffered on the sixth factor, which asks whether overt or subtle racial appeals have been used in political campaigns, also falls short. Plaintiffs offer the testimony of a Latino campaign worker who said four or five Aurora residents subjected him to racial epithets when he handed out literature for his sister's campaign. (*See* Pls.' Supplemental Br. Opp'n Defs.' Mot. Summ. J., Ex. 2, F. Chapa Dep. at 26-30.) The loathsome comments of a few City residents does not, however, suggest that the candidates themselves appealed to voters' racial prejudice, the gist of the sixth factor.

Plaintiffs also argue that two factors not enumerated in the Senate Report support their claim: (1) the City's lack of responsiveness to the needs of the Latino community; and (2) the tenuousness of the City's rationale for adopting the Ward Map. According to plaintiffs, the first factor is demonstrated by the City's failure to attempt to achieve proportional representation for Latinos until after the Latino community complained.

That is one interpretation of the mapping process, but it is not a reasonable one. It is undisputed that the ward map immediately preceding the one at issue in this case had three majority-Latino wards. (Pls.' LR 56.1(b)(3)(A) Stmt. ¶¶ 72-75.) It is also undisputed that the Council voted to repeal that map in favor of the Ward Map, which has two super-majority Latino wards and one

majority Latino ward, *in response* to complaints from the Latino community. (*Id.* ¶¶ 76-78.) The fact that the Council replaced two of the simple majority wards with two super-majority wards because of opposition from the Latino community, suggests that City officials are responsive to, rather than ignore, the concerns of that community.

Plaintiffs also cite the deposition testimony of Alderman Marquez as support for their claim that the City is not responsive to the needs of the Latino community. Alderman Marquez testified that he ran for alderman because Bill Cross, who occupied the position before him: (1) attempted, by use of a fraudulent petition, to stop the development of a Latino business; (2) supported an ordinance to require push-cart vendors, who are Latino, to remain stationary to sell their wares; (3) had no Latinos on his ward committee; and (4) did no outreach in the Latino community. (*See* Pls.' Supplemental Br. Opp'n Defs.' Mot. Summ. J., Ex. 3, Marquez Dep. at 21-29.)

Alderman Marquez's testimony certainly suggests that former Alderman Cross was not responsive to his Latino constituents. But there is no evidence to suggest that any of the other aldermen were similarly indifferent. Moreover, Marquez identifies only one action, the push cart ordinance, that was taken by the Council as a whole over the objections of Latino citizens. Evidence that one aldermen, who was later voted out of office, was unresponsive to Latino citizens and the Council passed one ordinance opposed by Latinos does not demonstrate a general lack of responsiveness on the part of the City to the members of that community.

Plaintiffs' other argument, that the City's tenuous rationale for adopting the Ward Map suggests that the Map is discriminatory, is also unpersuasive. The City says it decided to go from a map with eight wards and two at-large alderman to a map with ten wards and two at-large aldermen to "reduc[e] the number of constituents each alderman would have to serve." (Defs.' LR 56.1(a)

Stmt. ¶ 39.) Given that goal, plaintiffs say, it was illogical for the City to keep the at-large aldermen when abolishing those positions in favor of a twelve-ward map would have effected a greater constituency reduction.

Though a twelve-ward map may have maximized the alderman-to-constituent ratio, standing alone, the City's failure to adopt such a map proves little. There is no evidence, for example, that the at-large positions were created during the 2000 Census remapping. In fact, it is undisputed that the City had aldermen-at-large before that census data was released. (*See* Exs. Supp. Defs.' Mot. Summ. J., Ex. G, Spaeth Dep. at 55.) Similarly, there is no evidence that it would have been easier or cheaper for the City to eliminate the at-large positions and create two additional wards. Absent such evidence, the City's failure to adopt a map that effected the greatest reduction in aldermanic constituencies does not suggest that the Ward Map was adopted to prevent Latinos from electing representatives of their choice.

In sum, plaintiffs' only evidence that Latinos are prevented from electing representatives of their choice, despite their proportional representation on the Ward Map, is: (1) their expert reports, which show that voting in Aurora can be, but generally is not, severely polarized and that Latinos have not achieved electoral success in the City in direct proportion to their LCVAP; and (3) the testimony of Alderman Marquez that former Alderman Cross, who was subsequently voted out of office, was unresponsive to the Latino community, and that the City Council passed one ordinance over the objections of some Latino citizens. That evidence is not sufficient to raise a genuine issue of material fact as to whether the Ward Map violates Section 2 of the Voting Rights Act. Defendants are, therefore, entitled to judgment as matter of law on Count I.

Plaintiffs' lack of evidence to support the inference that the Ward Map discriminates against Latinos also dooms their Fourteenth Amendment claim. *See City of Mobile v. Bolden*, 446 U.S. 55, 67-68 & n.13 (stating that equal protection claim based on minority vote dilution requires proof of both discriminatory effect and discriminatory intent). Thus, defendants are entitled to a judgment as a matter of law on Count Two as well.

### Conclusion

For all of the reasons stated above, there is no genuine issue of material fact on plaintiffs' claims against defendants, who are entitled to judgment as a matter of law. Defendants' motion for summary judgment [doc. no. 74] is, therefore, granted. This case is terminated and any pending motions and dates are stricken as moot.

**SO ORDERED.**           ENTERED: March 13, 2006

_____
HON. RONALD A. GUZMAN
United States District Judge